DENNIS A. BASIL )
) No. 12 C 1341
PLAINTIFF, )
)
v. ) Judge Thomas M. Durkin
)
CC SERVICES, INC. AND ILLINOIS )
AGRICULTURAL ASSOCIATION, )
)
DEFENDANTS. )

## MEMORANDUM OPINION AND ORDER

Plaintiff Dennis A. Basil alleges that his former employers, defendants CC Services, Inc. ("CCS") and the Illinois Agricultural Association ("IAA"), fired him because he was over 40-years old, in violation of the Age Discrimination in Employment Act ("ADEA"), and in retaliation for filing a workers' compensation claim, in violation of Illinois law. He also claims that the defendants failed to accommodate his disability in violation of the Americans with Disabilities Act ("ADA"). The defendants have moved for summary judgment on all three claims. For the following reasons, the Court grants the defendants' motion.

## BACKGROUND

CCS employs individuals who work at various companies comprising Country Financial, which sells insurance among other financial products. R. 138 ¶ 1. CCS is headquartered in Bloomington, Illinois, and has offices in 14 states. *Id.* Basil worked for CCS as an at-will employee in its Joliet, Illinois office from June 3, 1985

to June 9, 2011. *Id.* ¶ 2.[1] From approximately 1998 to 2008, Basil worked as a "Field Property Specialist II," and as a "Claims Representative III-Field" from May 2008 until his termination. *Id.* ¶ 6. Employees in both positions are generically referred to as "claims representatives," and are "responsible for inspecting losses, meeting with insured[s], writing out payments when appropriate, maintaining files on all of [their] cases, and maintaining current and accurate summaries of [their] work and the status of [their] cases in CC Service's Shared Online Activity Log (OAL) system." *Id.* ¶ 8. They are also instructed to use a "Bring Up" system that "alerts and reminds the representatives of upcoming deadlines and important items on the representatives' to-do list such as sending out notice and updates to insureds or following up on the status of claims after a certain amount of time has passed." *Id.* ¶ 10. The primary difference between the two positions is that a Field Property Specialist II handles more complex claims than a Claims Representative III-Field. *Id.* ¶ 7. Larger, more complex losses entail a "much greater" amount of administrative work than smaller claims "that can be resolved at the time of the initial inspection, or relatively shortly thereafter." *Id.* ¶ 8. Claims representatives report to a Claims Supervisor, who is responsible for managing the office, assigning claims to representatives, and tracking the representatives' performance and workload. *Id.* ¶ 11. Claims Supervisors, in turn, report to Regional Directors who

---

[1]     The IAA is CCS's parent company. *See* R. 17 ¶ 2. Basil has not produced any evidence supporting his allegation that he was employed by the IAA besides his "understanding and belief that CCS was and is owned by" the IAA. R. 138 ¶ 2. This is insufficient to establish that the IAA employed Basil. So, the Court will refer to CCS throughout this opinion as Basil's sole employer.

are responsible for assisting and supporting Claims Supervisors to help them achieve CCS-imposed performance goals. *Id*.

## I.     Basil's Job Performance and Workers' Compensation Claims

### A.     Basil's Performance Reviews During the Period 1993-2004

CCS has included in its summary judgment materials Basil's year-end "Performance Reviews," prepared by his Claims Supervisors, for the period 1993 to 2010. His reviews for the years 1993 to 1999 were generally positive, with some criticisms of his organizational skills. *See* R. 124-3 (Performance Reviews 1993-2002); *see also* R. 124-5 at 5 (2003 Performance Review) ("He needs to document his files and keep them up to date to not only show his efforts but to keep files up to date in case he is out of the office."). He filed his first workers' compensation claim on January 26, 2000 for injuries he sustained in August 1999 when he fell off of an insured's roof. R. 149 ¶ 12. He injured his right knee in the fall, and missed "several days" of work after undergoing arthroscopic surgery. *Id*. Basil's Performance Reviews for the years 2000-2003 were comparable to his prior reviews. *See* R. 124-3 at 21 (2000 Performance Review: "Dennis contacts his insured[]s in a timely [manner], meeting our Best Practices. He inspects losses in a timely fashion."); *see also id*. at 22 (noting that his organizational skills were "improving"); *id*. at 25-33 (2001 and 2002 Performance Reviews); R. 124-5 (2003 Performance Review). His 2004 Performance Review also contained positive comments, but the overall tone of the review is more critical. *See*, *e.g.*, R. 124-6 at 3 (2004 Performance Review) ("Lack

of organization continues to be an issue for Dennis. This has been a fault for several years . . . .").

**B.    Basil's Performance Reviews During the Period 2004-2009**

After 2004, CCS's criticisms of Basil's performance became more pointed. In May 2005, it placed Basil on a "Performance Action Plan," which listed tasks the company required him to perform "[i]n order to meet and maintain the expected level of performance." R. 124-7; 138 ¶ 21. On November 7, 2005, CCS gave Basil a written warning regarding his performance. *See* R. 124-8 at 2 ("Dennis'[s] performance continues to be below the expected level."). His Performance Review for 2005 reflects the company's dissatisfaction. *See, e.g.*, R. 124-9 at 6 ("His lack of organization prohibits him from taking ownership of customer concerns and delays his ability to work to resolve these problems."). CCS verbally extended its prior written warning to Basil on February 2, 2006. R. 138 ¶ 21.

On September 29, 2006, Basil received a "Provisional Rating." *Id.* Receiving such a rating "reflects an unacceptable level of employee performance or behavior. Previous discussions with the employee have not resulted in appropriate corrective action. This rating represents a final warning that performance or behavior must change." *See* R. 124-10 at 2 (2006 Provisional Rating).

On October 2, 2006, Basil was injured when he stepped on a nail, and was later hospitalized with an allergic reaction to the antibiotics he received. R. 140-4 ¶ 17 (Basil Aff.). He missed a "few" days of work in connection with his hospitalization, but did not file a workers' compensation claim. *Id.*

Basil received another Provisional Rating on February 8, 2007, *see* R. 124-12 (2007 Provisional Rating), which the company removed in May 2007 because he had "improved his performance to an acceptable level." R. 124-13 at 2; *see also* R. 138 ¶ 23. In June 2007, John Butkus, CCS's Regional Director for the region including the Joliet office where Basil worked, received a complaint from an insured regarding Basil. *Id.* ¶ 24; R. 149 ¶ 6. The insured complained that Basil "failed to adequately explain his role to her after a fire loss, failed to take her questions and concerns seriously, failed to timely return her telephone calls and failed to timely process her claim." R. 138 ¶ 24. Basil's 2007 Performance Review acknowledged his improved performance in some areas, *see* R. 124-15 at 3 (noting that he had "improved his customer service results"), but continued to criticize his organizational skills:

> Dennis has weaknesses and inconsistencies in the maintenance of an active file bring-up system, organization of his workload, complete file documentation, follow up contacts, following company procedures, following up on Supervisor and Home Office recommendations and working proactively.

*Id.*

On February 13, 2008, CCS gave Basil another Provisional Rating. R. 138 ¶ 21; R. 124-16 (2008 Provisional Rating). Three months later, in May 2008, Basil asked his supervisor for a voluntary demotion to Claims Representative III-Field. R. 138 ¶ 25. CCS contends that Basil requested the demotion because his responsibilities as a Field Property Specialist II "were too much for him to handle given his ongoing issues with file maintenance and claims handling." *Id.* It denies that Basil ever told the company that he was requesting the demotion for health

reasons. *Id.* ¶ 29. Basil states that he told his supervisor that he wanted a demotion, "and an accommodation that included no large files, only small claims," because of his "heart condition." *Id.* ¶ 25. CCS granted the demotion, *see* R. 138 ¶ 27, although his salary remained the same. *Id.* ¶ 30. CCS contends that it lightened Basil's workload after the demotion; Basil contends that "his workload did not change in any way, and it remained exactly the same as before his voluntary demotion." *Id.* ¶ 31; *see also id.* ¶ 32 (disputing whether Basil complained to his supervisors that his duties had not been reduced).

Basil's supervisor noted in his 2008 Performance Review that Basil had met CCS's customer service goals, which it described as a "significant achievement," and that his "overall performance in 2008 ha[d] shown improvement." R. 124-19 at 3, 13. Nevertheless, his supervisor continued to criticize his organizational skills. *See id.* at 11 ("Dennis continues to struggle with prioritization and organization of his workload."). His Performance Review states that prior evaluations "completed over the past several years confirmed Dennis'[s] performance facilitated the need for demotion in June this year." R. 124-19 at 3. It also indicates that in his new position, he was assigned "less complicated claims." *Id.* Basil's "Cycle Time" improved after his demotion, but he "continue[d] to have weaknesses and inconsistencies in the maintenance of an active file bring-up system, organization of his workload, timely file documentation, and working proactively." *Id.*

On April 30, 2009, Basil was involved in a car accident while investigating claims in Alabama, injuring his head, wrists, and back. R. 149 ¶ 13. He was injured

again on August 20, 2009, when he stepped into a hole while inspecting a loss at an insured's farm. *Id.* ¶ 15. He filed separate workers' compensation claims with respect to these two incidents on December 1, 2009. *Id.* ¶ 14. Basil's supervisor at that time, Matt Rustemeyer, completed Basil's Performance Review for 2009 on January 20, 2010. *See* R. 124-20 at 2. The review is largely positive—*see, e.g., id.* at 3 ("There are several areas of performance that I have noticed throughout the year that Dennis excels at.")—although Rustemeyer reiterated some of the criticisms that Basil's prior supervisors had expressed. *See, e.g.*, *id.* ("He should work to become more organized.").

## B. Basil's Performance During 2010 and 2011

After a relatively positive year in 2009, CCS became more critical of Basil's performance in 2010 and 2011. On June 9, 2010, Butkus sent an email to Jeff Johnson—Basil's Claims Supervisor at that time—implicitly criticizing Basil's lack of organization. R. 22 at 2 (suggesting that Basil was not "maintaining a bring-up, status reports, regular contacts with our insureds, status letters, etc."). On June 17, 2010, Johnson was copied on an email from a person affiliated with an insured who was dissatisfied with Basil's performance. *See* R. 21 (Group Ex.) at Country-DB 1480. On July 11, 2010, Johnson sent Basil an email criticizing his delays in processing claims. *See id.* at Country-DB 1489 ("I have been very patient with your files over the last month. However, my patience has run out. You are not following through on your promises to update or conclude losses.").

On September 10, 2010, Basil was diagnosed with bilateral carpal tunnel and cubital tunnel syndrome arising out of his car accident in Alabama on April 30, 2009. R. 149 ¶ 16. Around this same time, Butkus began sharing information about Basil with Renee Haning, an Employee Relations Coordinator in CCS's Human Resources Department, "because it was becoming increasingly likely that Basil's employment would be terminated due to his ongoing performance issues." R. 138 ¶ 38 (citing R. 124-71 (Butkus Decl.) ¶ 48; R. 124-77 (Haning Decl.) ¶ 31).[2] After Butkus received comments from Haning on a proposed draft, CCS issued Basil another Provisional Rating (his fourth) on September 28, 2010. R. 138 ¶ 21; *see also* R. 24.

On December 13, 2010, Johnson drafted a "Provisional Review" noting that Basil's performance had improved after he received the Provisional Rating in September. R. 25 at 2; *see also id.* at 3 ("Dennis needs to continue this positive trend and I am going to continue to work with Dennis to find additional ways to improve his time management and organizational skills in all aspects of his job."). Basil's

---

[2]     Basil criticizes the declarations of CCS's employees because they are "nearly identical" and lack citations to other portions of the record. R. 138 ¶ 38. It is common knowledge that declarations are drafted by attorneys, so the similarities between the witnesses' declarations are neither surprising nor relevant. Provided that their statements fall within the scope of information about which the witnesses would have personal knowledge, those statements are admissible evidence, with or without corroboration. Clearly, Butkus and Haning are competent to testify about their discussions regarding Basil. Even assuming that corroboration was necessary, the portions of their declarations that CCS cites in ¶ 38 are consistent with emails in the record. *See* R. 23 (Group Ex.) (contemporaneous emails between Butkus to Haning about a draft final warning letter concerning Basil's performance). Whether these discussions were actually pretext for age discrimination (or workers' compensation retaliation) is a separate issue. *See infra.*

2010 Performance Review, dated January 11, 2011, praised his work ethic and his "positive attitude" since receiving his September 2010 final warning. R. 25 at 3. It also noted that Basil had made "positive strides" with respect to the organizational problems he had shown in the past. *Id.* at 10.

On January 25, 2011, an insured filed a complaint against CCS with the Illinois Department of Insurance for wrongfully denying coverage on a claim that Basil was handling. R. 21 at Country-DB 1426. In an email to Johnson and others enclosing the complaint, Butkus criticized Basil for failing to "secure a recorded statement from our insured during his first contact and while at the loss site. This would have tied down any disputes regarding the cause of the loss." *Id.* at Country-DB 1424.

On February 15, 2011, while inspecting a loss at an insured's home, Basil tripped on a defect in the sidewalk and injured his left shoulder and arm, including his rotator cuff. R. 149 ¶ 17.

On March 7, 2011, Johnson prepared a report summarizing Basil's performance during the first quarter of 2011. R. 27 at Country-DB 1462. The document identified Basil's delays in documenting particular claims, *see id.* at Country-DB 1467-70, and summarized in a chart his performance with respect to certain tasks. *Id.* at Country-DB 1463-66. Each task is expressed as a question—e.g., "Cause of loss verified?"—with a "yes" response indicating proper performance. *Id.* at Country-DB 1463. Basil's overall percentage of "yes" responses was 81.29%, *id.* at Country-DB 1466, with low scores some areas that were identified as

weaknesses in prior performance reviews. *See, e.g.*, *id.* at Country-DB 1464 ("Evidence of bring-up system?" (31.58%)). CCS expects its employees to adhere to its best practices 90% of the time. R. 138 ¶ 39. Butkus forwarded Johnson's report to Haning on March 8, 2011, noting Basil's "cycle of performance warnings" (improving for a short time period, then returning to his prior form). R. 28 at Country-DB 0368. Butkus went on to state, "I will advise you that in the past several years Dennis has submitted [workers' compensation] claims and those dates are: 8-27-99, 11-30-04, 10-2-06, 4-30-09, 9-01-09, 09-7-10, and 2-15-11." *Id.*[3]

On or about March 25, 2011, Butkus sent an email to Johnson (copying Haning) regarding Basil. R. 30 at Country-DB 0347. The email indicates that CCS was aware at that time that Basil "had spoken with his orthopedic [sic] and it was determined that it was a partial tear to his rotator cuff and they were going to treat with a cortisone shot and physical therapy." *Id.* In light of his physical condition, Butkus told Johnson that he had consulted with Haning and Barbara Taft, a member of CCS's legal department, and compiled talking points to guide Johnson in an upcoming meeting with Basil about his performance. *Id.* Butkus told Johnson to distinguish between performance issues that might be related to Basil's injury (e.g., arriving late for work), and his "overall performance and work product." *Id.* CCS would accommodate the former, but Basil's overall performance needed to improve.

---

[3]     These are actually the dates on which Basil was injured. *See* R. 138 ¶ 13.

*Id.* On March 28, 2010, Johnson met with Basil to discuss his performance and to explain that he needed to improve. R. 138 ¶ 40.[4]

On April 4, 2011, Basil called Johnson to tell him that he had experienced chest pain on his way to work and was not coming in. *Id.* ¶ 42. That same morning, Jeff Gendron, CCS's Senior Vice President of Property Casualty Operations, forwarded a customer complaint about Basil to Butkus and Tom Tracey, Butkus's direct supervisor. *Id.* ¶ 41. Butkus responded to Gendron that evening, stating that Johnson had resolved the insured's complaint that day because Basil was "ill." *See* R. 138 (Ex. 31) at Country-DB 1647. Butkus also indicated that the complaint was attributable, at least in part, to the fact that Basil had not followed Johnson's instructions regarding the claim. *Id.* Gendron asked Butkus whether Basil had "just drop[ped] the ball," and whether there were "other issues on claims involving Dennis Basil?" *Id.* Butkus responded as follows:

---

[4]    Basil, citing an email that Johnson sent to Butkus after their meeting, insists that the purpose of the meeting was to "discuss his positive mentoring of fellow employees 'Brad' and 'Jason'; his appreciation and understanding of Johnson's supervision; and, interesting [sic], status on Plaintiff's upcoming doctor appointments on Wednesday, Thursday and Friday, March 30, 31, and April 01, 2011." R. 138 ¶ 40. Basil's interpretation of this email is unreasonable. Johnson states that he "went over the items outlined in your [Butkus's] email" (presumably the March 25, 2011 talking-points email), explained to Basil that he needed to improve his performance, and Basil agreed. R. 124-60 at 2; *see also* R. 138 ¶ 40 (admitting that, "[d]uring the meeting, Basil acknowledged that his performance needed to improve"). According to Johnson's email, he and Basil discussed "Brad" and "Jason" only because Basil had said that he was not following the advice that he had given to these employees. *See* R. 124-60 at 2 ("He knows what he needs to do, he has preached concluding files at scene to Brad and Jason letting them know the importance of that so they don't fall behind. Today he told me that he has to start following his own advice on this. Hopefully he gets it.").

> Yes Dennis Basil drop[ped] the ball. We have him on final warning and I have been working with HR and OGC. The only reason we have not terminated to date is because he had a work comp claim 2-15-11 and OGC advised us to re-evaluate his performance in the next 30 days before we proceeded with the next step. We have other documented losses with delays and I will continue to work with OGC and HR. I had actually se[n]t the email from this morning to HR to provide them with another example of his work product.

*Id.*[5]

On April 8, 2011, after taking several days of paid leave, Basil requested (and was granted) medical leave due to a non-work related heart condition. R. 138 ¶ 42. His requested leave at that point was essentially open-ended. *Id.* That same day, Johnson began reviewing Basil's claims files in order to redistribute them to the representatives who would be handling those claims during his absence. *Id.* ¶ 43. In that connection, Johnson emailed Basil asking him whether he had any files with him so that Johnson could arrange to have them returned to the office. *Id.* Basil did not respond. *Id.* On April 10, 2011, Johnson began to review Basil's files and OAL entries to determine how much work needed to be reassigned to other representatives. *Id.* ¶ 48. During that process, Johnson discovered at least one additional claim that Basil had not handled promptly. *Id.*

On April 11, 2011, Basil filed two workers' compensation claims for the work-related injuries he suffered in April 2009 and February 2011, respectively. R. 149 ¶¶ 16, 19. CCS contends that on that same day Basil called Johnson and promised to return any work files in his possession by April 13, 2011. *Id.* ¶ 49. Basil denies

---

[5]    In fact, Basil was injured on February 15, 2011, but did not file his workers' compensation claim with respect to that injury until April, 11, 2011. *See* R. 149 ¶¶ 18-19.

that he ever made such a promise, *see id.* ¶ 50, but does state that he told Johnson that he "would do [his] best to return the files to the office." R. 140-4 (Basil Decl.).

On April 18, 2011, Basil drove to the Joliet office and returned three claims files to Johnson. R. 138 ¶ 53. Johnson asked Basil whether the three files were all the files that Basil had in his possession, and Basil responded that he "believed that's what [he] had." *Id.*

Johnson received a customer complaint on May 18, 2011 regarding Basil's failure to send an insurance check. *Id.* ¶ 54. Johnson investigated the matter and learned that Basil had recently recorded activity on the OAL log for the client's file and had attempted to process a check on the insured's behalf. *Id.* ¶ 55. He called Basil, who confirmed that he had not yet returned the customer's file, which he had left at his sister's home. *Id.* ¶ 58. Basil explained that he occasionally worked on insurance files at his sister's home because her internet connection was better than his. *Id.* The next day, May 19, 2011, Johnson called Basil regarding two more missing files for claims that Basil was handling. *Id.* ¶ 60. Basil admits that at least one of those two files was also at his sister's home. *Id.* On May 24, 2011, Basil returned four files to the office, even though Johnson had been aware of only three such files. *Id.* ¶ 61.

## II.    Basil's Termination

On or about June 6, 2011, Butkus—with the approval of CCS's HR and legal departments—recommended to Tracey that CCS terminate Basil's employment. *Id.* ¶ 62. The next day, Janine Schiebel, CCS's Leave of Absence Administrator, told

Johnson and Butkus that Basil's doctor had cleared him to return to work so long as his duties did not require "use of bilateral arms and hands." *Id.* ¶ 64. According to his treating physician, Dr. Mario Cote, an individual with Basil's limitations "would have a difficult time using their hands." *Id.* Also on June 7, 2011, Schiebel learned that Basil's "work comp surgery" had been scheduled for June 16. R. 140-25 at 3; *see also* R. 138 ¶ 67.

Grendon and Tracey approved the decision to terminate Basil's employment on June 8, 2011. *Id.* ¶ 63. When Basil arrived at the office the next day, June 9, 2011, he was fired. *Id.* ¶ 66. He was 52 at that time. *Id.* ¶ 2. A week later, Basil "underwent a left rotator cuff repair . . . for the injury sustained February 15, 2011." R. 149 ¶ 20. Butkus and Johnson interviewed several candidates to replace Basil in July 2011. R. 138 ¶ 73. Ultimately, they decided to transfer Megan McCarthy, an existing CCS employee, into the position. *Id.* McCarthy was 28 years old at that time. *Id.*

## Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013). To defeat summary judgment, a nonmovant must produce more than "a mere

scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

ANALYSIS

## I.     Basil's Age Discrimination Claim

The ADEA makes it unlawful for employers to discriminate against employees 40-years old or older because of their age. *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 603 (7th Cir. 2012) (citing 29 U.S.C. §§ 623(a)(1) and 631(a)). "In discrimination cases, the plaintiff can survive summary judgment under either the direct or indirect method." *Id.* Basil relies on the indirect method. *See* R. 141 at 12 n. 1. Under the indirect method, Basil must establish a prima facie case of discrimination, showing that (1) he was a member of a protected class; (2) he was performing his job satisfactorily; (3) he suffered an adverse employment action; and (4) CCS treated similarly-situated employees outside of the protected class more favorably. *See Hutt v. AbbVie Prods. LLC*, 757 F.3d 687, 693 (7th Cir. 2014). If Basil establishes a prima facie case of age discrimination, then CCS "must articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to [Basil] to submit evidence that [CCS's] explanation is pretextual." *Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 234 (7th Cir. 2014). It is undisputed that Basil was a member of the protected class and that termination

constitutes an adverse employment action. The parties dispute, however, whether Basil's job performance was satisfactory and whether CCS treated similarly-situated employees more favorably.

Basil has failed to produce evidence that would permit a reasonable jury to find that he was performing his job satisfactorily. He emphasizes that his Performance Reviews contained both positive and negative comments. *See* R. 141 at 13; R. 149 ¶ 38. This is true, but immaterial. CCS deemed Basil's *overall* performance so deficient that it gave him Provisional Ratings in 2005, 2006, 2008, and 2010. He continued to exhibit the same deficiencies in the first quarter of 2011, just prior to his hospitalization for heart problems. Basil has not shown that he was performing his job satisfactorily.

Basil has also failed to identify a similarly-situated employee whom CCS treated more favorably. "[T]he proposed comparator must be similar enough to permit a reasonable juror to infer, in light of all the circumstances, that an impermissible animus motivated the employer's decision." *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012). Basil points out that CCS did not fire Johnson (under 40), who has admitted that he sometimes takes files home with him. R. 141 at 13. But there is no evidence that Johnson had a comparable history of written warnings and substandard performance reviews. Also, Basil's emphasis on the mere fact of taking documents home mischaracterizes CCS's position. Basil left client files at his sister's home, and he failed to promptly disclose to Johnson all the files that he possessed. He is entitled to the inference that he was not deliberately impeding

Johnson's efforts to locate the files. *Cf.* R. 138 ¶ 57 ("Johnson believed that Basil had intentionally lied about returning all of the files in his possession on April 20, 2011, in order to prevent Johnson from learning that Basil had not been managing his files in a timely or appropriate manner."). Even so, his conduct was consistent with the company's longstanding complaints about his disorganization.

Even if Basil had established a prima facie case of age discrimination, he has not produced sufficient evidence to enable a reasonable jury to find that the reasons CCS gave for firing him were pretextual. CCS states that it fired Basil for his "ongoing and longstanding performance issues," as well as his conduct during his leave of absence with respect to client files. R. 138 ¶ 62. It is clear from the record that CCS considered Basil's disorganization a significant deficiency for a period of years. It was a recurring theme in his Performance Reviews between 2004 and 2010, and it led CCS to issue written warnings to Basil about his deficient performance four times. The fact that his Performance Reviews also contained positive statements is insufficient to create a genuine dispute of material fact regarding CCS's evaluation of his performance.

With respect to the second purported ground for his termination, Basil emphasizes the fact that CCS did not have a written policy prohibiting employees from taking insurance files home. R. 141 at 20. As the Court just discussed, CCS did not fire Basil simply because he took files home. The most favorable inference the Court can draw from his conduct is that he did not know how many files he had in his possession and where they were located. In his response to CCS's summary

judgment motion, Basil attributes his forgetfulness to "memory loss" and "inability to concentrate" stemming from his April 2009 car accident. R. 141 at 10; R. 149 ¶¶ 21-28. Basil reported experiencing memory lapses to his primary care physician in April and September 2009, and May 2011. R. 149 ¶ 22. At some point before 2011, Basil told Johnson (his supervisor) that he was suffering from depression brought about by chronic pain. *Id.* ¶ 25. Basil's physician testified that "depression potentially affects a patient's memory and recall," *id.* ¶ 24, and his retained expert has opined that his depression interfered with his "ability to function normally and perform his job duties prior to his termination." *Id.* ¶ 27; *see also id.* ¶ 28. The only evidence Basil cites for the proposition that CCS knew that his memory was impaired is Johnson's testimony that he was aware that Basil was depressed and "that depression and anxiety can affect somebody's ability to do their job." *See id.* ¶¶ 25-26; R. 140 at 108. There is no evidence supporting the conclusion that Johnson connected Basil's depression with memory loss, or that he believed that Basil misplaced the files because he was depressed. Even assuming that Basil's depression affected his memory, which in turn affected his job performance, and that CCS was aware of these facts, it is irrelevant to his claims in this lawsuit.

CCS is entitled to summary judgment on Basil's ADEA claim.

## II. Failure to Accommodate Basil's Disability

Basil alleges that CCS failed to make reasonable accommodations for his physical limitations upon his return to work in June 2011. R. 1 ¶ 25.[6] Under the ADA, it is unlawful for an employer to fail to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(a). To prevail on his failure-to-accommodate claim, Basil must show that: (1) he is a qualified individual with a disability; (2) CCS was aware of his disability; and (3) CCS failed to reasonably accommodate the disability. *See E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005).

"A qualified individual under the ADA is a person with a disability who is able to perform the essential functions of the job either with or without reasonable accommodation." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 533 (7th Cir. 2013) (citing 42 U.S.C. § 12111(8)). "[T]o determine whether a job function is essential, we look to

---

[6]     In his Rule 56.1(b)(3) statement, Basil contends that CCS failed to modify his workload to accommodate his heart condition following his voluntary demotion in 2008. *See* R. 138 ¶¶ 25-32. He did not develop this claim in discovery, (*see* R. 151-3 (Pl.'s Resp. to Defs.' Interrogs.) ¶ 8, R. 151-4 (Pl.'s Supp. Answer to Defs.' First Set of Interrogs.) ¶ 8), or in his memorandum in response the defendants' summary-judgment motion. *Cf.* R. 141 at 18 ("Defendants' failure to provide Plaintiff with the agreed upon accommodations *on the morning of June 09, 2011* is reason for this court to deny Defendants['] motion for summary judgment on the Plaintiff's ADA claim.") (emphasis added). The Court concludes that he has waived any ADA claim he might have made regarding his work assignments following his 2008 demotion. It is unnecessary, therefore, to address CCS's arguments regarding the timeliness and sufficiency of his allegations. *See* R. 148 at 15-20.

the employer's judgment, written job descriptions, the amount of time spent on the function, and the experience of those who previously or currently hold the position." *Id.* at 534 (citation and internal quotation marks omitted). The written job description for the Claims Representative III – Field position includes several physical requirements:

> Investigates more complex claims within prescribed limits . . . .
>
> [. . .]
>
> Completes physical inspections of the more extensive property damage losses (when necessary), evaluates damages, and prepares estimates according to policy provisions and liability.
>
> [. . .]
>
> As applicable, travels to loss location and evaluates property damage, determines coverage, and estimates damages.
>
> [. . .]
>
> Work is split approximately 60% field and 40% office within an assigned geographic territory. Must maintain a valid driver's license with the ability to drive an automobile.
>
> Has the physical dexterity to walk, reach, climb, and crawl to inspect damage, sometimes in unfavorable working conditions or inclement weather. Must be able to lift, carry, and climb ladders weighing up to 50 pounds (only applicable if assigned to work property claims).

R. 124-2 at 3. Basil contends that this description is inaccurate insofar as CCS had agreed in 2008 not to assign him to "large losses," (R. 138 ¶ 9 (citing R. 140-2 (Basil Dep.) at 191), even though in practice CCS did not change his workload in any way. R. 138 ¶ 31. It does not follow, however, that the job description is inaccurate. The

fact—according to Basil—that CCS required him to perform the job as set forth in the written job description actually supports its accuracy.

Basil admits that, on June 9, 2011, "he could not travel to job sites, he could not climb on a roof, he could not use his computer to look up or enter data, he could not walk, reach, climb, crawl to inspect damage, or carry ladders weighing up to 50 pounds." R. 138 ¶ 74. His treating physician, Dr. Cote, and Dr. Gates, the expert he retained in connection with this lawsuit, both state that at all times since June 2011 Basil has been physically unable to perform these duties. *Id.* ¶ 75. According to Dr. Gates, Basil could fulfill the functions of the position only if CCS hired another employee (or a "really good active robot") to perform the field work comprising 60% of the job. *Id.* ¶ 76. This is not a reasonable accommodation. *See Miller v. Ill. Dept. of Transp.*, 643 F.3d 190, 199 (7th Cir. 2011) (hiring a "helper" to perform the essential functions of the job is not a reasonable accommodation).

Nevertheless, Basil insists that he could still perform a claims representative's essential functions because Johnson told him that CCS *would* accommodate his disability. *See* R. 138 ¶¶ 74, 77-79. An accommodation is not reasonable simply because the employer agrees to provide it, *see Winfrey v. City of Chi.*, 259 F.3d 610, 616 (7th Cir. 2001), and Basil himself states that he has been physically unable to work since June 2011. R. 138 ¶ 74. The real thrust of Basil's argument is that Johnson lied when he said that CCS would accommodate his disability to lure him off of Family Medical Leave Act ("FMLA") leave so that CCS could fire him. *Id.* ¶ 77 (stating that Johnson "lied to [Basil] as he never intended to

accommodate his restrictions and merely wanted to get him off his medical leave of absence and FMLA leave so he could be terminated"). Basil has not cited any legal authority for the proposition that CCS was legally prohibited from firing him while he was on FMLA leave. But even if the Court accepted the premise of Basil's argument regarding CCS's motives, it has no bearing on his ability to perform the essential functions of his position.

No reasonable jury could conclude that Basil was qualified, with or without a reasonable accommodation, to perform the essential functions of a claims representative. So, CCS is entitled to summary judgment on Basil's ADA claim.

## III. Workers' Compensation Retaliation

### A.      Supplemental Jurisdiction

In federal question cases, there is a presumption in favor of relinquishing supplemental jurisdiction over state-law claims once the district court has resolved all federal claims. *RWJ Mgmt. Co., Inc. v. BP Prods. N. Am., Inc.*, 672 F.3d 476, 479 (7th Cir. 2012). "The presumption is rebuttable, 'but it should not be lightly abandoned, as it is based on a legitimate and substantial concern with minimizing federal intrusion into areas of purely state law." *Id.* (quoting *Khan v. State Oil Co.*, 93 F.3d 1358, 1366 (7th Cir.1996)). A district court properly retains supplemental jurisdiction after all the federal claims have been resolved when: "(1) the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3)

when it is absolutely clear how the pendent claims can be decided." *Id.* (citing *Sharp Elecs. Corp. v. Metro. Life Ins. Co.*, 578 F.3d 505, 514–15 (7th Cir. 2009)).

The Court has already committed substantial judicial resources to this five-year old case. The discovery process, including expert discovery, was lengthy and contentious. Magistrate Judge Rowland ruled on multiple discovery motions. *See* Rs. 39; 51; 56; 61; 62; 63; 69; 87; 94; 99; and 104. Also, the summary judgment record is substantial. The parties have filed more than 90 exhibits, and their Rule 56.1 statements and responses exceed 90 pages. Sending the case to state court at this point would "cause a substantial duplication of effort." *RWJ Mgmt.*, 672 F.3d at 479 (internal quotation marks omitted). And as the Court is about to discuss, the Court's finding in connection with Basil's ADEA claim that he has not established a triable issue of fact regarding CCS's motives for terminating him applies equally to his retaliation claim. *See infra.* For these reasons, the Court exercises its discretion to retain supplemental jurisdiction over Basil's state-law claim for workers' compensation retaliation.

## B. Workers' Compensation Retaliation

"Illinois law recognizes a cause of action for retaliatory discharge where an employee is terminated because of his actual or anticipated exercise of workers' compensation rights." *Phillips v. Cont'l Tire The Ams., LLC*, 743 F.3d 475, 477 (7th Cir. 2014) (citation and internal quotation marks omitted). To prevail on his retaliatory discharge claim, Basil must prove: "(1) that he was an employee before the injury; (2) that he exercised a right granted by the Workers' Compensation Act;

and (3) that he was discharged and that the discharge was causally related to his [pursuit of] a claim under the Workers' Compensation Act." *Id*. Unlike a Title VII retaliation case, the burden never shifts to the employer to articulate a non-retaliatory reason for terminating the plaintiff. *See Clemons v. Mech. Devices Co.*, 704 N.E.2d 403, 407-08 (Ill. 1998) (rejecting the *McDonnell-Douglas* burden-shifting approach in workers' compensation retaliation claims); *see also Gacek v. Am. Airlines, Inc.*, 614 F.3d 298, 300-03 (7th Cir. 2010) (holding that *Clemons*'s rejection of the burden-shifting approach is substantive law, and thus binding on federal courts exercising diversity jurisdiction). But where, as here, the employer chooses to offer an explanation for discharging an at-will employee, the plaintiff must establish that the employer's explanation is pretextual. *Casanova v. Am. Airlines, Inc.*, 616 F.3d 695, 698 (7th Cir. 2010) (citing *Clemons*, 704 N.E.2d at 406).

Basil effectively acknowledges that CCS did not retaliate against him at or around the time that he filed workers' compensation claims in 2000 and 2009. *See* R. 141 at 19. After he filed his January 26, 2000 claim, CCS gave Basil's performance relatively high marks in 2001, 2002, and 2003. He filed his second and third workers' compensation claims on December 1, 2009. R. 149 ¶¶ 14-15. Six weeks later, he received his most positive Performance Review in five years. *See* R. 124-20.

Basil argues, however, that his April 2011 claim differed from prior claims because it was the first claim that would entail substantial time off work. *See* R. 141 at 19. There are several problems with Basil's theory. First, he has not adequately

explained why CCS would distinguish between time off for non-work related injuries (such as the chest pains that led him to take medical leave in April and May 2011), and time off for injuries eligible for workers' compensation insurance. Second, he missed work in 2000 when he had arthroscopic knee surgery for which he claimed workers' compensation insurance. R. 149 ¶ 12. There is no evidence that CCS retaliated against Basil on that occasion.[7] Third, CCS began laying the groundwork to fire Basil in September 2010, nine months after he filed his December 2009 claims and five months *before* he injured his rotator cuff. Those plans were well underway in March 2011 when Johnson met with Basil to explain that his performance had to improve. CCS anticipated at that time that Basil would eventually file a workers' compensation claim for the injury he suffered on February 15, 2011. But Basil has not cited any evidence that the defendants knew at that time that he was going to have rotator-cuff surgery; indeed, there is no evidence that *Basil* knew that he was going to have surgery at that time. In that sense, Basil's anticipated workers' compensation claim was no different than the three claims he had already filed where no adverse action had been taken against him.

Even assuming that Basil had produced facts sufficient to permit a jury to find a connection between his workers' compensation claims and his termination, he

---

[7]     Basil seems to imply that his rotator-cuff surgery was going to entail more time off work than his previous surgery to repair his knee. See R. 149 ¶ 12 (stating that after he injured his knee he "missed no time from work until he was forced to undergo a right knee arthroscopy, resulting in several days off work"). Basil's statement that he missed "several days" of work in connection with his knee surgery is vague, and there is no evidence in the record regarding how long it would take to recover from his shoulder surgery.

has failed to show that CCS's stated reasons for firing him were pretextual. As the Court discussed in connection with his ADEA claim, Basil has not identified a genuine dispute of material fact regarding CCS's motives for firing him. *See supra.* CCS consistently registered its dissatisfaction with Basil's disorganization over a period of years. Its criticisms of the way he handled client files during his leave of absence are consistent with the company's longstanding assessment of his performance. A reasonable jury could not find on this record that the reasons CCS gave for terminating Basil were pretextual.

CCS is entitled to summary judgment on Basil's workers' compensation retaliation claim.

## CONCLUSION

For the foregoing reasons, the Court grants the defendants' motion for summary judgment, R. 121.

ENTERED:

*Thomas M Durkin*

Honorable Thomas M. Durkin
United States District Judge

Dated: July 20, 2015